[784 NYS2d 178]

In the Matter of SHERWIN-WILLIAMS COMPANY, Petitioner, v TAX APPEALS TRIBUNAL OF THE DEPARTMENT OF TAXATION AND FINANCE OF THE STATE OF NEW YORK et al., Respondents.

Third Department, October 28, 2004

### APPEARANCES OF COUNSEL

*Morrison & Foerster L.L.P.,* New York City (*Paul H. Frankel* of counsel), for petitioner.

*Eliot Spitzer, Attorney General,* Albany (*Robert M. Goldfarb* of counsel), for Commissioner of Taxation and Finance, respondent.

*Michael A. Cardozo, Corporation Counsel,* New York City (*Robert J. Firestone* of counsel), for City of New York, amicus curiae.

### OPINION OF THE COURT

Lahtinen, J.

Petitioner contends that respondents erred in requiring it to file a combined corporate franchise tax report in 1991 with two of its subsidiaries pursuant to Tax Law § 211. Petitioner is an Ohio corporation that does business in New York. Its activities include, among others, the manufacture and sale of various coatings under a variety of brand names, such as "Sherwin-Williams," "Dutch-Boy," "Martin-Senour," "Dupli-Color" and "Krylon." As part of its business, petitioner uses a host of trademarks, trade names and service marks (hereinafter collectively referred to as trademarks). In January 1991, petitioner created two wholly-owned Delaware corporations, Sherwin-Williams Investment Management Company, Inc. (hereinafter SWIMC) and Dupli-Color Investment Management Company, Inc. (hereinafter DIMC), to hold and manage its trademarks.[1] Petitioner transferred over 400 domestic trademarks associated with its nonaerosol products to SWIMC in exchange for all that company's common stock and entered into a like arrangement with DIMC regarding over 100 of its aerosol-related trademarks. All of the trademarks transferred to the subsidiaries were then licensed back to petitioner in exchange for the payment of royalties based on a specific percentage of net sales.[2]

In its 1991 corporate franchise tax return, petitioner deducted

---

1. SWIMC is wholly-owned by petitioner. Petitioner owns 85% of DIMC and the other 15% is owned by Dupli-Color Products Company, which is a wholly-owned subsidiary of petitioner.

2. The royalty income was not taxable in Delaware, which exempts from corporate income tax corporations whose activities are confined to mainte-

the trademark royalty payments it made to the subsidiaries. Respondent Commissioner of Taxation and Finance determined that petitioner should file its tax return on a combined basis with SWIMC and DIMC and, thus, a deduction for royalties paid to those subsidiaries was not permitted. The Division of Taxation (hereinafter Division) assessed, in 1997, a deficiency of $196,536 for 1991. Petitioner requested a conciliation conference, which resulted in a conciliation order sustaining the tax. Petitioner then filed a petition with the Division of Tax Appeals protesting the notice of deficiency. Following an extensive hearing that included testimony from numerous expert witnesses and the submission of approximately 150 exhibits, the Administrative Law Judge (hereinafter ALJ) concluded in a June 2001 determination that petitioner was not required to file a combined corporation franchise tax report with its two subsidiaries. The Division filed an exception. Thereafter, respondent Tax Appeals Tribunal issued a lengthy written decision in which it reversed the ALJ's determination and sustained the notice of deficiency. This CPLR article 78 proceeding by petitioner ensued.

Tax Law article 9-A imposes a corporate franchise tax on corporations doing business in New York (*see* Tax Law § 209 [1]). The Commissioner is afforded discretion to permit or require a corporation paying the New York tax to file a combined report with other corporations that the taxpayer controls (*see* Tax Law § 211 [4]; *Matter of Campbell Sales Co. v New York State Tax Commn.*, 68 NY2d 617, 619-620 [1986], *cert denied* 479 US 1088 [1987]; *Matter of Wurlitzer Co. v State Tax Commn.*, 35 NY2d 100, 105 [1974]; *Matter of Standard Mfg. Co. v Tax Commn. of State of N.Y.*, 114 AD2d 138, 140 [1986], *affd* 69 NY2d 635 [1986], *appeal dismissed* 481 US 1044 [1987]). Requirements that must undergird a decision permitting or mandating a combined report include: (1) the taxpayer owns or controls substantially all the stock of the other corporations; (2) the group of corporations are engaged in a unitary business; and (3) a distortion of income would result if the corporations reported separately (*see* 20 NYCRR subpart 6-2). For purposes of these proceedings, petitioner has not contested that the first two conditions were satisfied.

With respect to the third condition, a presumption of distortion arises "when the taxpayer reports on a separate basis if

---

nance and management of intangible investments (*see* Del Code Ann, tit 30, § 1902 [b] [8]).

there are substantial intercorporate transactions among the corporations" (20 NYCRR 6-2.3 [a], [b]; *see* 20 NYCRR 6-2.5). The Tribunal found that petitioner had substantial intercorporate transactions with the subsidiaries and, therefore, the presumption of distortion applied. The Tribunal further found that petitioner failed to rebut the presumption because petitioner's assignment and license-back transactions with the subsidiaries lacked a business purpose or economic substance apart from tax avoidance and the royalties paid by petitioner were not at arm's length rates. Petitioner disputes each of these findings, contending that its transactions with SWIMC and DIMC did not constitute substantial intercorporate transactions (and thus that the presumption of distortion should not have been used), its transactions were for viable business purposes and the royalty rates were within the range acceptable in the market.

We turn first to petitioner's argument that the intercorporate transactions that are a predicate to the presumption of distortion should be analyzed solely from its perspective as the taxpayer and not include the perspective of SWIMC and DIMC. Reviewing the transaction solely from petitioner's vantage point reveals that its transactions with the subsidiaries were a relatively small part of petitioner's overall corporate transactions. However, the regulations do not require such a constricted analysis (*see* 20 NYCRR 6-2.3 [a], [c]), and the Tribunal's interpretation of the pertinent statute and regulations is reasonable (*see Matter of Upstate Farms Coop. v Tax Appeals Trib. of State of N.Y.*, 290 AD2d 896, 900-901 [2002]; *Matter of Clinton Hill Equities Group v Tax Appeals Trib. of State of N.Y.*, 240 AD2d 992, 993 [1997], *lv denied* 90 NY2d 808 [1997]). The narrow application urged by petitioner would severely restrict an apparent purpose of the underlying statute (*see* Tax Law § 211 [4]) and, indeed, would essentially foreclose combined reporting whenever a taxpayer was a large corporation. Here, the subsidiaries received the overwhelming majority of their income from petitioner. The record amply supports the Tribunal's determination that sufficient intercorporate transactions occurred among the corporations to implicate the rebuttable presumption of distortion.

Next, we consider whether substantial evidence supports the Tribunal's determination that petitioner failed to rebut the presumption of distortion. In such regard, "the ultimate question [is] whether, under all of the circumstances of the

intercompany relationship in this case, combined reporting fulfills the statutory purpose of avoiding distortion of and more realistically portraying true income" (*Matter of Standard Mfg. Co. v Tax Commn. of State of N.Y., supra* at 141). This is a fact-driven analysis and, to rebut the presumption of distortion, consideration is given to whether petitioner established a "transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached" (*Frank Lyon Co. v United States*, 435 US 561, 583-584 [1978]).

Reasons set forth by petitioner for forming the subsidiaries included improving quality control oversight of the trademarks, providing flexibility in preventing hostile takeovers, increasing investment return, affording liability protection, and taking advantage of Delaware's corporate tax exemption for investment management and trademark holding companies. Petitioner presented evidence that it had been a target of an unsuccessful hostile takeover and it had also lost one of its trademarks ostensibly due, in part, to the decentralized monitoring of the trademarks. The Division, on the other hand, drew attention to facts establishing that both subsidiaries were run on a part-time basis by Donald Puglisi[3] (a professor in Delaware who had no background in trademark management), management of the trademarks had been contracted by the subsidiaries back to petitioner, and the subsidiaries had recycled most of the royalty payments back to petitioner as loans.

Petitioner's experts included Richard Pomp, a professor at the University of Connecticut Law School who testified as a tax policy expert. While he acknowledged that some Delaware holding companies are established solely to avoid taxes, he opined that such was not the situation with SWIMC and DIMC because, among other things, petitioner had experienced a problem with managing and protecting its trademarks. Richard Billovits testified for petitioner on behalf of American Appraisal Associates, which had been retained in November 1990 to determine the fair market value of petitioner's trademarks and an appropriate royalty rate. Billovits explained how the royalty rates were calculated and then discounted to derive their present value,

---

**3.** Puglisi was elected president and treasurer of both subsidiaries. Other directors were John Ault, petitioner's vice president and controller, and Conway Ivy, petitioner's vice president and treasurer. Later, a Delaware attorney was added to the board of directors of each of the subsidiaries.

and opined that the rates charged by the subsidiaries to petitioner constituted arm's length rates. Further expert testimony was provided by attorney Spiro Bereveskos, who stated that the structuring of the assignment and license-back of the trademarks was done in a manner that did not risk invalidating the trademarks. A senior manager at Grant Thornton, LLP, Per Hasenwinkle, explained a transfer pricing report prepared by Grant Thornton and concluded that the royalty rates were arm's length.

The Division's primary expert was Alan Shapiro, a professor of economics and finance at the University of Southern California. Shapiro testified that the subsidiaries were unable to add value to the trademarks and that, objectively viewed, the transaction lacked economic substance because there was no reasonable expectation of benefits exceeding costs. He explained that the value of a trademark is principally tied to it being recognized and reflecting the quality and service associated with products bearing that trademark. Thus, according to Shapiro, trademarks cannot be managed "independently of the core branded products and the knowledge that comes from managing those products." He further set forth the reasons for his conclusions that the subsidiaries failed to provide any meaningful quality control, that the arrangement did not protect against a hostile takeover and that creating the subsidiaries did not advance the goal of limiting liability. Shapiro also addressed, in a separate report as well as in his testimony, the issue of the royalty rates, and he opined they were not arm's length transactions. The Division elicited testimony from another expert, attorney Lee Bromberg, who asserted that the transfer and license-back of the trademarks provided no advantage from the perspective of trademark law and practice and, in fact, created disadvantages, including a risk of invalidation.

Analysis of this evidence and the rest of the voluminous record reveals facts and opinions providing support for the positions advocated by both petitioner and the Commissioner. However, our review of a determination of the Tribunal is limited (*see Matter of American Tel. & Tel. Co. v State Tax Commn.*, 61 NY2d 393, 400 [1984]; *Matter of Standard Mfg. Co. v Tax Commn. of State of N.Y.*, 114 AD2d 138, 141 [1986], *supra*). If the "determination is rationally based upon and supported by substantial evidence . . . [it] must be confirmed by this Court" (*Matter of Transervice Lease Corp. v Tax Appeals Trib. of State of N.Y.*, 214 AD2d 775, 777 [1995]; *see Matter of McKee v Com-*

*missioner of Taxation & Fin.*, 2 AD3d 1077, 1078 [2003], *lv denied* 2 NY3d 701 [2004]). Hence, even if we disagree with a determination, "we are not at liberty to substitute our judgment for a rational determination by the Tribunal that is supported by substantial evidence merely because it is possible to reasonably reach a different conclusion" (*Matter of Peterson Petroleum of N.H. v Tax Appeals Trib. of State of N.Y.*, 236 AD2d 752, 754 [1997]). Here, the Tribunal's determination that petitioner failed to rebut the presumption of distortion since the assignment and license-back transaction lacked a business purpose or economic substance apart from tax avoidance is supported by substantial evidence. We are unpersuaded that the Tribunal erred in crediting the expert testimony offered by the Division over petitioner's experts. Having found substantial evidence to support the Tribunal's determination of a lack of a business purpose and economic substance, it is not necessary to address the separate ground of whether the royalty rates reflected market rates.

Petitioner places significant reliance upon the fact that the ALJ ruled in its favor and that it successfully challenged the amount of its corporate tax in Massachusetts (*see Sherwin-Williams Co. v Commissioner of Revenue*, 438 Mass 71, 778 NE2d 504 [2002]). The Tribunal was authorized to perform a de novo review of the record and was not bound by the ALJ's determination (*see Matter of American Express Co. v Tax Appeals Trib. of State of N.Y.*, 190 AD2d 104, 109 [1993], *lv denied* 82 NY2d 663 [1993]). With respect to the case from Massachusetts, that case does not control because, in addition to being from another jurisdiction, the applicable laws in Massachusetts and New York are not identical (*compare* Mass Gen Laws Ann, ch 63, § 39A, *with* Tax Law § 211 [4]).

Finally, we are unpersuaded by petitioner's contention that requiring it to file a combined corporate franchise tax violated its constitutional rights under the Due Process Clause and the Commerce Clause. Petitioner failed to produce evidence satisfying its burden of demonstrating a violation of the US Constitution (*see Matter of Wurlitzer Co. v State Tax Commn.*, 35 NY2d 100, 104 [1974], *supra*; *Matter of Capital Fin. Corp. v Commissioner of Taxation & Fin.*, 218 AD2d 230, 232 [1996], *appeal dismissed* 88 NY2d 874 [1996], *lv denied* 88 NY2d 811 [1996]; *Matter of Standard Mfg. Co. v Tax Commn. of State of N.Y.*, *supra* at 142-143; *cf. Matter of British Land [Maryland] v Tax Appeals Trib. of State of N.Y.*, 85 NY2d 139, 146 [1995]).

CREW III, J.P., PETERS, CARPINELLO and MUGGLIN, JJ., concur.

Adjudged that the determination is confirmed, without costs, and petition dismissed.